BENETTON SPORTSYSTEM USA, INC., Plaintiff–Appellant,

v.

FIRST TEAM SPORTS, INC., Defendant–Appellee.

No. 02–1004.

United States Court of Appeals, Federal Circuit.

June 14, 2002.

Before MAYER, Chief Judge, NEWMAN, and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

Benetton Sportsystem USA, Inc., appeals the decision of the United States District Court for the District of New Jersey granting summary judgment of noninfringement in favor of First Team Sports, Inc. *See Benetton Sportsystem USA, Inc. v. First Team Sports, Inc.*, No. 00–2452 (D.N.J. Aug. 9, 2001). Because the district court improperly construed the claims, we *reverse* and *remand.*

## I

Benetton Sportsystem USA, Inc. ("Benetton") is the holder of U.S. Patent No. 6,050,574 ("the '574 patent"), entitled "Adjustable Fit In–Line Skate," which issued on April 18, 2000. The '574 patent is directed towards a common problem faced by consumers seeking to purchase in-line skates, also known as rollerblades, for young children. As any parent knows, children's rapid growth requires frequent purchases of new shoes or skates. For quality in-line skates, this can prove quite expensive.

## A

The invention described in the '574 patent purports to solve this problem by describing an in-line skate that can be expanded to accommodate different-sized feet. The patent claims recite a boot containing both a heel portion and a toe portion, the latter being "slidable" relative to the heel portion. Further, the claims also recite a liner for the in-line skate, specifying that this liner include an "extendible region," allowing the liner to adjust to accommodate different-sized feet. The present dispute centers on claim construction issues regarding the liner.

Claims 1 and 2 are in suit and recite:

1. An adjustable in-line skate comprising:

a rigid frame having a plurality of in-line skate wheels secured thereto;

a boot including a heel portion, a toe portion and a cuff portion positioned generally above the heel portion;

the heel portion being fixedly connected to the frame and the cuff portion pivotally connected to the heel portion;

the toe portion being slidable relative to the heel portion along a line of travel generally parallel to a longitudinal dimension of the skate; and a liner having a heel end, a toe end, a cuff and a tongue, the liner sized for the toe end to

be received within the toe portion, the heel end to be received within the heel portion, and the cuff to be received within the cuff portion of the boot, the liner including a generally inelastic heel region and *an extendible region positioned between a toe region of the liner and the tongue,* the extendible region being configured to allow the toe end to be moved longitudinally relative to the tongue and heel end such that the liner can accommodate feet of different sizes.

2.   The in-line skate of claim 1, wherein the extendable region is elastic.

'574 patent, col. 4, lines 18–43. (emphasis added).

### B

Benetton sued First Team Sportsystem, Inc. ("First Team") on the '574 patent. The accused First Team device contains a liner including both an inelastic heel and an elastic front portion, forward of the tongue and extending all the way to the front tip of the liner. The district court found that, "[e]ssentially, the entire toe end stretches to accommodate different sized feet." *Benetton,* slip op. at 6.

Before the district court, First Team filed a motion for summary judgment of noninfringement. After briefing and oral argument, the district court construed the claim term "positioned between" to require that the extendible portion of the liner lie entirely between the toe region and the tongue. *Id.* at 18. The district court consequently found that, because in the accused device "the extendible region is positioned in the same place as the toe region," no reasonable juror could conclude that the extendible region was located entirely between the toe region and the tongue. *Id.* As a result, the district court found that there could be no literal infringement of the patent claims.

The district court further concluded that there could be no infringement under the doctrine of equivalents under our decision in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 234 F.3d 558, 56 USPQ2d 1865 (Fed.Cir.2000) (en banc), *cert. granted,* 533 U.S. 915, 121 S.Ct. 2519, 150 L.Ed.2d 692 (2001). Further, the court found that even without resort to *Festo,* the patentee's amendment of the patent claims in light of the Scholz prior art reference surrendered coverage of an expandable region not positioned entirely between the toe region and the tongue. *Benetton,* slip op. at 23.

On appeal, Benetton challenges only the district court's claim construction.

### II

We review a district court's grant of summary judgment *de novo. Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994). Summary judgment is appropriate when no genuine issue of material fact exists. *See* Fed.R.Civ.P. 56(c). We must draw all reasonable factual inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The issue on appeal is solely one of claim construction, a question of law that we review *de novo. Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1456, 46 USPQ2d 1169, 1174 (Fed.Cir.1998) (en banc).

This case rests on the proper interpretation of the phrase "extendible region positioned between a toe region of the liner and the tongue." First Team argues in favor of the interpretation advanced by the district court, that the term "positioned between" introduces a requirement that the extendible region be located entirely behind the toe region, rather than covering all or part of the toe region. In contrast,

Benetton argues that the term "positioned between" does not so limit the claimed invention, covering an invention in which the extendible region overlaps or entirely covers the toe region.

A

"An infringement analysis is a two-step process in which the court first determines, as a matter of law, the correct claim scope, and then the fact-finder compares the properly construed claim to the accused device to determine, as a matter of fact, whether all of the claim limitations are present, either literally or by a substantial equivalent in the accused device." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1341, 60 USPQ2d 1851, 1853 (Fed. Cir.2001); *see also K–2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362, 52 USPQ2d 1001, 1004 (Fed.Cir.1999); *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 988, 50 USPQ2d 1607, 1609 (Fed.Cir. 1999).

Claim construction begins first with an analysis of the language of the claims themselves. *Rexnord*, 274 F.3d at 1341, 60 USPQ2d at 1854; *Hockerson–Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 955, 55 USPQ2d 1487, 1490 (Fed.Cir. 2000). Terms in a patent claim are generally given their plain, ordinary and accustomed meaning to one of ordinary skill in the relevant art. *Id.* A word or phrase used consistently throughout the patent claims should be interpreted consistently. *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1030, 61 USPQ2d 1470, 1476 (Fed.Cir.2002); *Rexnord*, 274 F.3d at 1342, 60 USPQ2d at 1854.

■ After identifying the plain meaning of a disputed claim term, the court examines the written description and the drawings to determine whether use of that term is consistent with the ordinary meaning of the term. *Day Int'l, Inc. v. Reeves*

*Bros., Inc.*, 260 F.3d 1343, 1348, 59 USPQ2d 1790, 1793 (Fed.Cir.2001); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979–80, 34 USPQ2d 1321, 1330 (Fed.Cir.1995) (en banc) ("Claims must be read in view of the specification, of which they are a part."), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). This presumption in favor of the ordinary meaning of claim language as understood by one of ordinary skill in the art is overcome where: 1) the patentee has clearly and explicitly defined the claim term; or 2) where the claim term would render the claim devoid of clarity. *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1370, 61 USPQ2d 1647, 1656 (Fed.Cir.2002) (internal citations omitted). Similarly, the examination of the written description and drawings is necessary to determine whether the patentee has disclaimed subject matter or has otherwise limited the scope of the claims. *Rexnord*, 274 F.3d at 1343, 60 USPQ2d at 1854; *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344, 58 USPQ2d 1059, 1065 (Fed.Cir.2001).

■ Notwithstanding the fact that the claim language must be examined in light of the specification, limitations from the specification may not be read into the claims. *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187, 48 USPQ2d 1001, 1005 (Fed.Cir.1998). Similarly, the mere fact that the patent drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration. *See Hockerson–Halberstadt, Inc.*, 222 F.3d at 956, 55 USPQ2d at 1491 (holding that the patent drawings "do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue"). We have recognized that there is

sometimes "a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Comark Communications,* 156 F.3d at 1186, 48 USPQ2d at 1005.

The consistent usage in the written description of different terms to refer to separate and distinct concepts can assist in interpreting a disputed claim term. *Bell Atlantic Network Servs., Inc. v. Covad Communications Group, Inc.,* 262 F.3d 1258, 1270–73, 59 USPQ2d 1865, 1872–74 (Fed.Cir.2001) (finding that the specification's differing usage of "rate" and "mode" to refer to separate concepts operated to limit the "broad and amorphous" ordinary meaning of the term "mode"). The consistent usage of the disputed term in a manner inconsistent with the interpretation proffered by a party can provide similar assistance. *See Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.,* 285 F.3d 1353, 1357–58, 62 USPQ2d 1266, 1269–70 (Fed. Cir.2002) (rejecting an interpretation of "support wires" to cover an entire assembly of separate wires welded together, when the specification referred to a number of other wires in the assembly as "border wires" and "connector wires," and referenced individual "support wire ends" as attaching to the border wire).

As we stated in *Rexnord,* "[a]fter examining the written description and the drawings, the same confirmatory measure must be taken with the prosecution history, since statements made during the prosecution of a patent may affect the scope of the invention." *Rexnord,* 274 F.3d at 1343, 60 USPQ2d at 1855. In some cases, this may take the form of an express disclaimer of a particular claim construction. *See Ballard Med. Prods. v. Allegiance Healthcare Corp.,* 268 F.3d 1352, 1361–62, 60 USPQ2d 1493, 1500–01 (Fed.Cir.2001) (finding an explicit disclaimer of "pressure valves" and "dynamic seals" when the patentee had so

characterized the prior art valves during the patent prosecution, and had asserted that his invention, in contrast, comprised "vacuum valves" and "static seals"). In others, the statements may offer interpretative assistance to the court in choosing a particular claim construction. *See Rheox, Inc. v. Entact, Inc.,* 276 F.3d 1319, 1325–27, 61 USPQ2d 1368, 1372–74 (Fed.Cir. 2002) (rejecting a patentee's argument that the broader, ordinary meaning of "calcium orthophosphate" should apply, finding that claim amendments and statements during prosecution as to the water-insolubility of the invention operated to exclude the more narrow category of monocalcium orthophosphate).

### · B

■ Here, the district court found the plain meaning of the term "positioned between" to be uncertain, encompassing two alternative meanings, either referring to the space "in an intermediate position in relation to two other objects" or to the space "limited by two objects." *Benetton,* slip op. at 12. The court found the first definition supportive of a claim interpretation requiring only that some portion of the extendible region be located between the toe region and the tongue (thus leaving open the possibility that the extendible region extends to cover the entire front portion of the liner). In contrast, the court found the second definition consistent with an interpretation that the extendible region must be located entirely between the toe region and the tongue (requiring some form of toe region distinctly separate from the extendible region). *Id.* at 12–13.

The preferred embodiment of the liner shows the elastic extendible region as strictly defined by two rigid borders, the tongue and the rearward defining line of the toe region. The written description of

the drawing refers to a "generally inelastic toe portion" joined to "the generally inelastic main body portion" by "an expandable resilient section." '574 patent, col. 3, lines 62–64. These references in the specification support the notion that the toe portion and the main body portion have distinct, carefully delineated boundaries. The district court, however, was careful not to use the preferred embodiment to narrow the disputed claim limitation. Instead, the district court rested its conclusion on evidence found in the file history.

With regard to the prosecution history, the district court examined the effect of the patentee's amendment and statements to distinguish over the PTO's rejection in light of the Scholz prior art patent. In order to distinguish over Scholz's disclosure of a stocking protector with an elastic extendable region in the mid-foot area, the patentee replaced the phrase "positioned adjacent to a toe region of the liner" with the phrase "positioned between a toe region of the liner and the tongue." As the district court correctly noted, if the extendible region of the liner · defined in the patent reached beyond the tongue and toward the heel, "that liner would wholly resemble the stocking protector claimed in the Scholz patent." *Benetton*, slip op. at 17. It was therefore necessary for the patentee to amend the claim to avoid this potential conflict with Scholz. According to the district court, the patentee included the "between" language to create a clear rear boundary of the extendible region, the tongue, and that the same reasoning required finding a front boundary of the extendible region, namely the toe region. In the district court's own language,

Because the claim must be interpreted to require that no part of the extendible region extends beyond the tongue towards the heel, the claim must also be construed to mean that no part of the extendible region extends in the other direction—beyond the toe region towards the toe end.

*Id.* at 17–18.

As the accused device has an extendible region which covers the entire forward part of the shoe, the court found that no toe region separate from the extendible region existed, and thus that the extendible region could not be "between" the toe region and the tongue. *Id.* at 18–19. As a result, the district court concluded that summary judgment of noninfringement was appropriate. *Id.*[1]

For the reasons given below, we conclude that this was in error.

### C

The critical phrase in question is "extendible region positioned between a toe region of the liner and the tongue." Benetton argues that while the claim explicitly requires the heel to be inelastic, it says nothing about the elasticity of the toe nor about the existence of any particular boundary location between the extendible region and the toe region. As a result, according to Benetton, the district court improperly construed the claim to exclude a liner in which the entire forward part of the liner is elastic. First Team argues that such an interpretation would have the effect of reading the claims to merely require an extendible region positioned forward of the tongue, essentially reading out the meaning of the word "between."

---

**1.** The district court noted that it was uncertain as to the definition or extent of the recited toe region, stating that "[t]he Court does not mean to suggest that the toe region is clearly marked. For the purposes of this action, it is unnecessary to know the exact area of what is referred to in the claim as the 'toe region.'" *Benetton*, slip op. at 18.

As the district court correctly noted, the adverb "between" can refer to the space "in an intermediate position in relation to two other objects," or to "filling the space limited by two objects." *Id.* at 12. While the former definition would allow the extendible region to overlap with the toe region, the latter would suggest the contrary.

The district court focused its attention on the need to define the word "between" in the context of this patent, and in the process did not focus on whether the term "toe region" bears a particular meaning. The patent speaks in terms of "portion" and "region" when describing the toe area of the boot and liner. The claim terms and the written description consistently refer to "portion" when defining the toe area of the boot, and thus define the toe area of the boot as restricted by delineated boundaries. Not so with respect to the toe area of the liner. The claim language speaks of a "toe region." The patentee's deliberate choice of different language to define the toe area of the boot and of the liner certainly suggests that the two terms need not bear the same meaning. The written description's use of "portion" to describe the toe area of the liner is consistent with the preferred embodiment of the liner, which indeed shows a clearly delineated toe area, a toe "portion." But as the district court correctly surmised, we cannot narrow the meaning of toe "region" simply because of the preferred embodiment.

We find the interpretation of "toe region" to be of critical importance in construing the claims. It is precisely the positioning of the extendible region in relation to the toe region that the parties adamantly dispute. To the extent that the "toe region" refers to an object distinctly separate from the "extendible region," there is a need for a delineating boundary of some kind between the two. Such a case would correspond with the district court's analysis of the latter of the two definitions of "between." In contrast, if the "toe region" of the liner is merely understood as an indeterminate reference to the generic part of the liner where the toes reside, then it is eminently possible for the extendible region extending forward of the tongue to lie between the toe region and the tongue, while at the same time extending yet further to cover the entire front portion of the liner.

The most relevant dictionary definition of "region" is "an indefinite area surrounding a specified body part." *Webster's New Third International Dictionary* 1912 (1993). Other definitions similarly comprise a quality of indefiniteness. *Id.* (providing alternative definitions as "a major indefinite division of inanimate creation" and "a broad geographical region . . ."). We note that in common parlance, when a weather forecast predicts thunderstorms between the Mississippi and Ohio Rivers, there is some sense that the rivers delimit the zone of rain on either side. In contrast, if the prediction is for thunderstorms between the Mississippi River and the Northeast region, residents of Missouri can leave their raincoats at home while those as far away as Maine may feel compelled to bring theirs out.

The preferred embodiment does depict an "extendible section" distinctly separate from the inelastic toe. Figure 2 of the '574 patent (below) illustrates this.

**FIG. 2**

The preferred embodiment provides that "The present liner 110 includes a *generally inelastic toe portion 112* joined to the generally inelastic main body portion 114 by an expandable resilient section 116 positioned surrounding the instep area of the foot." '574 patent, col. 3, lines 62–65 (emphasis added).

As our "case law is clear that an applicant is not required to describe in the specification every conceivable embodiment of the invention," *Rexnord,* 274 F.3d at 1344, 60 USPQ2d at 1856, it would of course be improper to conclude that merely because the preferred embodiment and the drawings reveal an inelastic toe clearly distinct from an "extendible section," the claim language itself must contain a similar requirement. Rather, the importance of the written description here lies in its use of language. The written description does not refer to a "toe region," but rather to a "toe portion." This is consistent with the references in the patent to the different component parts of the in-line skate itself as definite, distinct "cuff," "heel," and "toe" "portions." *See* '574 patent, col. 1, lines 42–47 (stating that "[t]he heel portion includes a sole and the heel portion is fixed to the frame" and "[t]he toe portion is slidable relative to the heel portion"). In contrast, the term "region" is not used in the specification at all.[2] This difference in usage suggests that the patentee employed "portion" to refer to distinctly separate objects, while reserving "region" to refer to a more indeterminate area.

Next, we consider the effect of the patentee's amendment to distinguish over the prior art Scholz patent, a diagram of which is reproduced below.

**2.** Indeed, unlike the "toe," "cuff," and "heel" "portions," there is no anatomical reason why an "extendible region" could not overlap entirely with the "toe region."

The examiner stated:

Scholz teaches having a sock-like structure (liner) with a generally inelastic heel region (d) and an elastic extendible region (e) positioned adjacent to a toe region of the liner, the extendable region being configured to allow the toe end to be moved longitudinally relative to the heel end such that the liner can accommodate feet of different sizes.

In response, the patentee amended the claims as follows (additions are underlined, deleted elements are in brackets):

a liner having a heel end, [and] a toe end, *a cuff and a tongue,* the liner sized for the toe end to be received within the toe portion, and the heel end to be received within the heel portion, *and the cuff to be received within the cuff portion of the boot,* the liner including a generally inelastic heel region and an extendible region positioned [adjacent to] *between* a toe region of the liner *and the tongue,* the extendible region being configured to allow the toe end to be moved longitudinally relative to the *tongue and* heel end such that the liner can accommodate feet of different sizes.

According to First Team, in delineating the tongue as a clear rear boundary for the extendible region, this amendment must also be interpreted as requiring a clear forward boundary between the tongue and the toe region. We agree with First Team that Scholz stood in the patentee's way, but we do not agree that the patentee needed to provide *both* a precise front and rear boundary for the extendible region in order to distinguish the invention over Scholz. The mere fact that the patentee added a further level of specificity as to the rear boundary does not necessarily say anything about the *forward* boundary of the extendible region. *See Spectrum Int'l, Inc. v. Sterilite Corp.,* 164 F.3d 1372, 1378–79, 49 USPQ2d 1065, 1069 (Fed.Cir. 1998) (stating that "[E]xplicit arguments made during prosecution to overcome prior art can lead to narrow claim interpretations .... '[b]y distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover' (quoting *Ekchian v. Home Depot, Inc.,* 104 F.3d 1299, 1304, 41 U.S.P.Q.2d 1364, 1368 (Fed.Cir.1997)).").  It was enough for the patentee to mark a clear boundary in the heel area to overcome Scholz, as the district court recognized. First Team's argument, and the district court's conclusion on the point, assumes that a patentee surrenders more than is necessary to overcome prior art. That view is mistaken; we can fairly presume that the patentee makes only necessary surrenders.

Further, the examiner's Notice of Allowable Subject Matter indicates a similar understanding of the amendment, stating

that "Scholz shows an elastic region in a liner, however the elastic region is not arranged between the *toe end* and the tongue area." (emphasis added). In employing the term "toe end" rather than "toe region," the examiner indicated an understanding that the amended language merely served to introduce a rearward boundary, rather than a forward one, on the "extendible region." Indeed, the examiner's language would appear to contemplate precisely the situation posed by the accused device, in which the elastic region of the accused product extends to cover the entire front part of the shoe.

### D

In the context of this patent, we think it clear that the patentee chose the claim's words with care. "Portion" is a word used to define an area that has particular boundaries. "Area" is a word used in the written description to describe a part of a foot, as in "surrounding the instep area of the foot." '574 patent, col. 3, line 65. "Area" lacks the precision of "portion," as does "region."

Both the language of the claims and the specification support an interpretation of "toe region" as a generic reference to the region of the liner where the toes reside rather than requiring a discrete part of the liner separate from the "extendible region." Further, the prosecution history clearly indicates that in amending the patent claims, the patentee had no need to introduce a requirement of a fixed forward boundary to the "extendible region." Nor did the examiner understand the amendment to have such an effect. As a result, the disputed phrase "extendible region positioned between a toe region of the liner and the tongue" should be construed to cover a liner in which the "extendible region" overlaps or entirely covers the "toe region."

### CONCLUSION

For the foregoing reasons, we reverse the district court's grant of summary judgment as to noninfringement and remand for proceedings not inconsistent with this decision.

### COSTS

No costs.

NEWMAN, Circuit Judge, dissenting.

NEWMAN, Circuit Judge.

The district court, in a thorough and well-reasoned analysis of the claims, the specification, and the prior art, correctly held that "between" refers to a space limited by two objects; there is no flaw in the court's reasoning that "[b]ecause the claim must be interpreted to require that no part of the extendible region extends beyond the tongue towards the heel, the claim must also be construed to mean that no part of the extendible region extends in the other direction—beyond the toe region toward the toe end." The use of the word "region" does not affect this clear logic. There appears to be no "critical" distinction between "region" and "portion"; it is no more likely that two "regions" intersect than that two "portions" intersect, whatever the geographic analogy. Thus I would affirm the district court's claim construction and the judgment based thereon.